IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DIANNA FREEMAN, individually and on behalf of
M.W. and J.C., and PAUL HORNE,

                            Plaintiffs,

    v.                                                          OPINION and ORDER

RYAN HENDERSON, CALEB JOHNSON,                                    21-cv-292-jdp
MATT NORDQUIST, MATT SCHROEDL,
FRANK SIMPSON, JOSEPH WEBERPAL,
JOHN DOE and JANE DOE,

                            Defendants.[1]

---

On the morning of June 18, 2019, several officers from the Madison Police Department, with their guns drawn, forcibly entered the apartment of plaintiff Dianna Freeman. The officers believed that a man named Quanteze Campbell was running a heroin operation out of the apartment. But Campbell was not there. Instead, officers discovered a different man—plaintiff Paul Horne—along with six children. Officers placed Horne in handcuffs, put him in a squad car, and took him to the police station to question him. More than two hours later, police released Horne.

As it turns out, the officers went to the wrong apartment. Both Campbell and plaintiffs lived in the Revival Ridge apartment complex, and both lived in Apartment 204. But they lived in different buildings with different addresses. The officers went to Apartment 204 at 4711 Jenewein Road rather than Campbell's apartment around the corner at 2313 Allied Drive. Plaintiffs had no connection to Campbell.

---

[1] The court has substituted the minors' initials for their full names to protect their privacy.

Plaintiffs are suing six Madison police officers who were involved in investigating or executing the search warrant.[2] Plaintiffs say that the officers violated the Fourth Amendment by failing to confirm Campbell's address before seeking a warrant, pointing their guns at Freeman's children, detaining Horne, and searching the apartment. Defendants move for summary judgment on each of these claims. Dkt. 30. The court will grant defendants' motion in part and deny it in part.

The efforts of defendants Caleb Johnson and Ryan Henderson to confirm Campbell's address were not robust. They relied on unidentified area residents who said that Cambpell "possibly" lived at 4711 Jenewein and Henderson's sighting of a car that may have belonged to Campbell in the garage for 4711 Jenewein. As plaintiffs point out, defendants easily could have confirmed Campbell's address by asking the property manager at the apartment complex. Defendants offer no reason why they failed to take that simple step before seeking authorization for an armed swat team to raid the apartment, risking the lives of the occupants inside. The consequences of defendants' sloppy police work could have been tragic.

That being said, a showing of poor judgment isn't enough to prevail on plaintiffs' claim based on the failure to investigate. Before a plaintiff may recover damages for a Fourth Amendment violation, she must show that the defendants violated clearly established law. This is where plaintiffs' claim fails. Plaintiffs have not cited authority holding either that officers violated the Fourth Amendment under similar circumstances or that basic Fourth Amendment principles made it obvious that defendants were violating the law. So the court will grant

---

[2] Plaintiffs also include "John Doe" and "John Doe" in the caption of their complaint. But plaintiffs have neither moved to amend their complaint to substitute officers for the unknown defendants nor asked for an extension of time to do so, so the court will dismiss the Doe defendants.

summary judgment to defendants on this claim, as well as the claims based on the defendants' show of force and the search of the apartment.

But the court will deny summary judgment to defendants Johnson, Weberpal, Nordquist, and Schroedl on Horne's claim that he was detained unlawfully. A reasonable jury could find that defendants knew quickly after detaining Horne that he was not Campbell, and defendants point to no other evidence they were aware of that would have connected Horne to criminal activity. Clearly established law holds that officers may not detain someone under those circumstances, so the court will allow the unlawful detention claim to proceed against these four defendants.

## UNDISPUTED FACTS

The following facts are undisputed, unless otherwise noted.

**A. Investigation leading up to the search warrant**

In June 2019, a confidential informant contacted defendant Caleb Johnson, who was then a detective for the Madison Police Department. The informant provided Johnson with the following information about possible heroin trafficking by someone the informant knew only as "T-Money":

- The informant had been receiving heroin from T-Money on a weekly basis.

- T-Money had shown the informant a large amount cash and told the informant that it was $50,000.

- T-Money stored his supply of heroin in his apartment.

- T-Money lived on the third floor of an apartment complex "off" Allied Drive, near the neighborhood center.

- The informant had been inside T-Money's apartment numerous times, including earlier that month.

- T-Money drove a blue Audi SUV with tinted windows, which was often parked in the underground garage of the apartment complex.

- T-Money was an approximately 40-year-old Black male with a thin build and short hair.

- T-Money had access to firearms.

Johnson shared this information with defendant Matt Schroedl, a sergeant for the Madison Police Department. Schroedl told Johnson that defendant Ryan Henderson, an officer for the department, had told Schroedl that a heroin dealer by the name of T-Money lived at 4711 Jenewein Road.[3] At the time, Henderson was the "neighborhood police officer" for the Allied Drive area.

Henderson believed that T-Money was a nickname for Quanteze Campbell, who Henderson "was familiar with." Dkt. 34, ¶ 9. "Multiple" residents "in the Allied Drive area" told Henderson that Campbell "was possibly residing in the building at 4711 Jenewein Road." *Id.*, ¶ 15. Henderson had seen a blue Audi SUV parked in the garage for the 4711 Jenewein Building. *Id.*, ¶ 12.[4]

Johnson went to the property manager's office for Revival Ridge Apartments, which includes the building at 4711 Jenewein Road. The complex also includes a building at 2313

---

[3] Henderson says in his declaration that he had this conversation with Johnson directly. *See* Dkt. 34, ¶ 9. Regardless, Johnson says in his declaration that he relied on Henderson when preparing the search warrant affidavit, *see* Dkt. 35, ¶ 34, so Henderson's knowledge may be imputed to Johnson. *See Suarez v. Town of Ogden Dunes, Ind.*, 581 F.3d 591, 597 (7th Cir. 2009) ("Officer Trowbridge was entitled to rely on the collective knowledge of all the investigating officers in making out his warrant request.").

[4] In their opening brief, defendants say that Johnson later saw the same car parked in spot 204 in the 4711 Jenewein garage, Dkt. 31, at 11, but defendants cite no evidence to support that statement, and defendants do not include the statement in their proposed findings of fact.

Allied Drive. The two buildings are perpendicular to each other, approximately 20–30 feet apart.  An aerial view of the two buildings is shown below, with the neighborhood center (MMSD Learning Center) just to the north of the complex:



The two buildings have the same number of floors and the same apartment numbers.

Inside the property manager's office, Johnson located a file folder labeled "B204," which held rental information related to a tenant named Latoya Genus. [5] The file included the names

---

[5] Plaintiffs say that Johnson and Henderson provided inconsistent testimony about how Johnson gained access to the rental files, that the apartment complex's property manager

of three minor children, one of whom had the last name Campbell. Johnson says that "the information he had gathered indicated that the target apartment was 204." Dkt. 35, ¶ 27.[6] Johnson did not know what the "B" in front of "204" on the file folder meant.[7]

Johnson then went to the parking garage under 4711 Jenewein. From there, Johnson discovered that he had to walk up two floors to reach Apartment 204, which Johnson believed was why the informant said that the apartment was on the third floor.

Johnson showed the informant photographs of Campbell and Genus, which Johnson obtained from the Law Enforcement Records Management System. The informant confirmed that Campbell was T-Money and Genus was the woman who lived in the apartment with him. Johnson looked through two law enforcement databases to identify Genus's address, but the

---

contradicted defendants' testimony that they had permission from management to access the files, and that defendants did not have a warrant to search the files. Dkt. 46, at 16–17. Plaintiffs appear to be suggesting that Johnson and Henderson's search of the files violated the Fourth Amendment, but plaintiffs do not contend that Johnson searched *their* rental file. "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. U.S.*, 394 U.S. 165, 174 (1969). So even if defendants violated the Fourth Amendment rights of the company running the complex or of Latoya Genus, that would not give plaintiffs the right to assert a claim on this issue.

[6] Defendants submitted no proposed findings of fact about how Johnson determined that Campbell was living in Apartment 204. Defendants say in their brief (without citation) that the informant provided that information, Dkt. 31, at 11, but a brief isn't evidence. *Box v. A & P Tea Co.*, 772 F.2d 1372, 1379 n.5 (7th Cir. 1985). A review of Johnson's declaration and deposition did not reveal the basis for Johnson's conclusion either. And the only information pointing in that direction in the office records was that a child in Apartment 204 had the same last name as Campbell. But plaintiffs aren't contending that defendants failed to adequately corroborate the apartment number (which turned out to be correct), so the court need not consider that issue.

[7] Plaintiffs say in their brief that the "B" was an internal designation for the building at 2313 Allied Drive, Dkt. 46, at 2, but they don't include a citation supporting that statement.

most recent information was from 2015. A search through public court records showed a paternity case between Campbell and Genus.

Johnson used the website ZetX to look for the phone number that the informant had given him. The website showed that the number belonged to Genus. A PEN register showed that the number was associated with Revival Ridge Apartments, but it did not identify which building.

Johnson applied for a no-knock search warrant based on this information, and a circuit court judge approved the warrant on June 17, 2019.

**B. Execution of the warrant**

On June 18, a swat team including defendants Schroedl, Joseph Weberpal, and Matt Nordquist arrived at the entry door for Apartment 204 at 4711 Jenewein Road. Each of them had been shown photographs of Campbell and Genus shortly before arriving at the apartment.

Officers used a ram to breach the door.[8] They entered the apartment with their guns drawn. Officers saw an adult male, who was later determined to be plaintiff Paul Horne, and three children.[9] Horne was the boyfriend of plaintiff Diana Freeman, who was renting the apartment. She was not present. The video does not show Horne clearly, and neither side cited other evidence of Horne's physical appearance, but the video shows that Horne is a Black male with long hair.

---

[8] The following four paragraphs come from the defendants' proposed findings of fact and directly from a video taken from a body camera that defendant Nordquist was wearing. Dkt. 39. Plaintiffs submitted no proposed findings of fact of their own, and neither side submitted videos from any officer on the scene other than Nordquist.

[9] Neither side identifies who these children were or whether M.W. or J.C. were among them.

Horne and the children were together in the living room. Officers announced themselves as "police department" and yelled "hands up" numerous times. Another officer said in a calmer voice, "Kids, you're ok, come to us, it's ok guys. Madison Police. Boys come to me." Officers continued to yell "hands up" while more calmly directing the boys and telling them, "you're not in trouble." The officers in view of the camera pointed their guns down as Horne and the boys passed by them and were directed out of the apartment. Horne and the boys were out of the apartment and out of camera view in less than a minute after the officers entered the apartment. Weberpal immediately placed Horne in handcuffs as he left the apartment.

Officers continued going through the apartment, looking for other occupants. They called out "Madison police, search warrant" as they opened a door to a bedroom where three girls were in their beds, one of whom was still asleep.[10] The camera is not pointed in the bedroom as the first officers enter. One officer says, "come on out." A few seconds later, an officer says, "hands up," and then "you're ok." As the officers look through the room, they continue talking to the girls, again telling them to keep their hands up and that "it's ok." An officer also says, "we're not here to hurt anybody." In a less than a minute, the officers direct the two girls who were awake out of the room, allowing the third girl to continue sleeping.

About a minute later, one of the officers says, "Hey, we don't have our target. Do they know that?" The video ends a few minutes later without further incident. Off camera, the sleeping girl was awoken and led outside.

---

[10] Again, neither side says whether any of these children were M.W. or J.C.

Within a few minutes, the apartment was secured, and both the occupants and the defendants were outside. A different set of officers conducted a search, which revealed a digital scale, a firearm with an "obliterated" serial number, and ammunition. Dkt. 45, ¶ 14.

"[A]t some point" while plaintiffs' apartment was being searched, Johnson concluded that officers had the wrong apartment, based on "information from initially the SWAT team that served the warrant and then the people who were on scene investigating." Dkt. 28 (Johnson Dep. 22:17–19). Johnson doesn't say what that information was. He directed officers to stop conducting a search.

Still in handcuffs, Horne was placed in defendant Frank Simpson's squad car, where Horne waited for approximately 30 minutes. He was then taken to the police station, where he waited for another 15–20 minutes before speaking to an officer for about 20–30 minutes. After another 15 minutes, officers removed Horne's handcuffs while Horne smoked a cigarette outside. Officers placed Horne in handcuffs again when they drove him home in a squad car, telling him that it was "protocol."

Officers arrested Cambbell later that day after discovering that he was residing at Apartment 204 in the same apartment complex as plaintiffs, but in the building at 2313 Allied Drive. The parties don't say how officers made that determination.

ANALYSIS

Plaintiffs are asserting four claims under the Fourth Amendment: (1) the entry into plaintiffs' apartment was unlawful; (2) the officers' show of force against M.W. and J.C. was excessive; (3) Horne's detention wasn't supported by probable cause; and (4) the officers'

search of the apartment continued even after they should have known that they were in the wrong apartment.

Defendants seek summary judgment on each claim on the grounds that they didn't violate the Fourth Amendment, and, even if they did, they are entitled to qualified immunity. Generally, a defendant is entitled to qualified immunity unless the plaintiff shows not only that the defendant violated his rights, but also that his rights were clearly established at the relevant time. The plaintiff can meet this burden by pointing to either: (1) a closely analogous, binding case that was decided in his favor; (2) a more general constitutional rule that applies "with obvious clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021). In deciding whether the defendants are entitled to qualified immunity on a motion for summary judgment, the court must view the evidence in the light most favorable to plaintiffs and ask whether a reasonable jury could find that defendants violated the plaintiff's clearly established rights. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

## A. Entry into plaintiffs' apartment

The first question is whether defendants' entry into plaintiffs' apartment violated the Fourth Amendment. In cases like this one involving a search warrant, the basic question is whether the warrant was supported by probable cause, which means that there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The parties agree that defendants had probable cause to believe that someone named Quanteze Campbell was selling heroin out of Apartment 204 in the Revival Ridge Apartments in Madison, Wisconsin. The question is whether defendants were justified in believing that

Campbell lived at 4711 Jenewein Road, which turned out to be plaintiffs' address; Campbell lived at 2313 Allied Drive.

Plaintiffs say the error was the result of defendants' failure to do two things: (1) corroborate the statements of the confidential informant; and (2) particularly describe the place to be searched. Both of these contentions are wrong. Neither side cites any evidence that the informant ever provided Johnson with Campbell's address. Rather, the informant told Johnson that Campbell lived on the third floor of an apartment complex "off" Allied Drive, near the neighborhood center. So it isn't an issue of failing to corroborate the informant. And the search warrant *does* particularly describe the place to be searched: it identifies "4711 Jenewein Road, apartment 204, Madison, Wisconsin" at "the Revival Ridge Apartments" as the place to be searched. Dkt. 35-2. The problem wasn't a vague or ambiguous description; it was that 4711 Jenewein Road was not Campbell's address.[11]

The basis for the address in the warrant came from Johnson's statement in the affidavit that he "is also aware that Campbell lives at 4711 Jenewein Road, apartment 204." *Id.*, at 11. That statement implicates *Franks v. Delaware*, 438 U.S. 154, 155 (1978), which holds that a search-warrant affidavit is invalid under some circumstances if it includes false statements or omits information. When the affidavit includes a false statement, the warrant is invalid if the officer made the statement knowing it was false or with reckless disregard for the truth, and

---

[11] Both sides rely on cases in which the court of appeals considered search warrants that contained incomplete addresses or were otherwise ambiguous. *See, e.g.*, *Maryland v. Garrison*, 480 U.S. 79, 80 (1987); *Muhammad v. Pearson*, 900 F.3d 898, 901 (7th Cir. 2018); *U.S. v. McMillian*, 786 F.3d 630, 639–40 (7th Cir. 2015); *U.S. v. Kelly*, 772 F.3d 1072, 1082–83 (7th Cir. 2014); *Jones v. Wilhelm*, 425 F.3d 455, 462–64 (7th Cir. 2005). These cases aren't instructive because the warrant in this case wasn't incomplete or ambiguous; the address was simply wrong.

the false statement was necessary to the finding of probable cause. *See U.S. v. Woolsey*, 535 F.3d 540, 547–48 (7th Cir. 2008). When the affidavit omits information, the warrant is invalid if the officer did so intentionally or recklessly, and the affidavit would not establish probable cause if the omitted information were included. *See Whitlock v. Brown*, 596 F.3d 406, 410–11 (7th Cir. 2010). An officer who violates the *Franks* rule may be sued for money damages under 42 U.S.C. § 1983. *Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1441 (7th Cir. 1994).

Defendants cited the *Franks* rule in their opening brief, and they explained why they believed that they did not violate *Franks*. Dkt. 31, at 12–13. Plaintiffs did not address the issue in their response brief, instead focusing on the other issues discussed above. This suggests that plaintiffs forfeited the issue. *See Terry v. Gary Community School Corporation*, 910 F.3d 1000, 1009 (7th Cir. 2018). But even if they didn't, the court concludes that defendants are entitled to summary judgment on this claim.

There are two potential arguments that Johnson's statement violated the *Franks* rule. The first is that Johnson knew or recklessly disregarded that 4711 Jenewein was not Campbell's address and that probable cause would not support the affidavit without the address. The second is that he intentionally or recklessly omitted facts about the basis for his conclusion that 4711 Jenewein was Campbell's address and that the affidavit wouldn't be supported by probable cause if that information had been included. The court will consider both possibilities.

Plaintiffs cite no evidence that either Johnson or Henderson was aware that 4711 Jenewein was the wrong address. As for reckless disregard, that is demonstrated if the officers "entertained serious doubts as to the truth of their statements" or "had obvious reasons to doubt the accuracy of the information reported." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). The court of appeals discussed an example of reckless disregard in

*Taylor v. Hughes*, 26 F.4th 419 (7th Cir. 2022), which involved a warrant that authorized the search of "645 W. 62nd Street #1S." The officer who applied for the warrant later admitted that he knew that there were four apartments in the building, and he didn't know which of the four was the right one. So he just guessed. *Id.* at 423–24. Under these circumstances, the court held that the officer recklessly disregarded the truth. *Id.* at 428–30.

*Taylor* is readily distinguishable from this case because Johnson and Henderson did more than just guess. They relied on statements from multiple witnesses and on the presence of what appeared to be the target's car in the garage of the building at issue. As will be discussed below, the evidence was thin, but plaintiffs do not point to "obvious reasons" why Johnson and Henderson should have doubted that evidence. And neither side has cited any authority for the proposition that an officer acts with reckless disregard for the truth by relying on limited evidence for one aspect of the search warrant.

As for the information that Johnson omitted, the court will assume that Johnson did so intentionally or recklessly. But that leaves the question whether the warrant would be supported by probable cause if Johnson had explained the basis for his conclusion that 4711 Jenewein was Campbell's address. That's a closer call. In concluding that Campbell lived at 4711 Jenewein, Johnson relied on representations by Henderson. Henderson, in turn, relied on statements from "multiple residents in the Allied Drive area" that Campbell "was possibly residing in the building at 4711 Jenewein Road" and on his own observation that he had seen a car matching the description of Campbell's car parked in the garage for the 4711 Jenewein building. Dkt. 34, ¶¶ 12, 15.

That evidence is not a strong basis to support a key fact in the search-warrant affidavit. Defendants did not identify any records tying Campbell to that address, *see, e.g.*, *U.S. v. Gregory*,

795 F.3d 735, 741–42 (7th Cir. 2015), personally observe Campbell going into or coming out of the building, *see, e.g., U.S. v. Bacon*, 991 F.3d 835, 838 (7th Cir. 2021), or take the confidential informant to the address to confirm where the alleged buys had occurred, *see, e.g., Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1057 (7th Cir. 2018). Officers did *attempt* to confirm the address by looking at law enforcement databases and rental files and by using a website to connect an address to the phone number of the woman believed to be a cohabitant with Campbell. But none of those attempts turned up helpful information, and defendants cite no authority for the view that an unsuccessful attempt can provide the basis for probable cause.

It appears that Henderson relied on citizen informants, who are "inherently more reliable than the usual police informants who are often mired in some criminal activity themselves." *Edwards v. Cabrera*, 58 F.3d 290, 294 (7th Cir. 1995) (internal quotation marks omitted); *see also J.B. v. Washington County*, 127 F.3d 919, 929–30 (10th Cir. 1997) ("[P]robable cause case law emphasizes the importance of corroboration of some amount of the anonymous tipster's information in establishing probable cause, while presuming the reliability of citizen informants."). But defendants don't identify who the residents were, how many residents Henderson spoke with, why he believed the residents were reliable, or why the residents believed that Campbell "possibly" lived at 4711 Jenewein.

Defendants rely on *Wade v. Ramos*, 26 F.4th 440 (7th Cir. 2022), which involved a confidential informant who told officers about someone he believed was selling drugs on "the second floor" of a particular building. As it turned out, the suspect was working out of the first floor of the building. The officer did nothing to corroborate the informant's statement, leading the court to observe that the officer "could and should have done more to confirm which unit Johnson occupied. Address verification would have spared the [the plaintiffs] from a violent

intrusion by the police and it would have saved the burden and expense of litigation for the City." *Id.* at 447. But the court concluded that "other circumstances compensate for the lack of corroboration," including that the informant's statements were very detailed on issues other than the target's address, such as the type and quantity of drugs at issue, the apartment's layout, the drugs' specific location in the apartment, and the various sorts of packaging used for the drugs. *Id.*

*Wade* is not on all fours with this case because the citizen informants that Johnson and Henderson relied on to determine Campbell's address did not provide other details about Campbell or his alleged drug operation, or, if they did, defendants have not provided that information to the court. But Johnson did obtain that type of information from the confidential informant, and that information was consistent with the information provided by the citizen informants. Specifically, the informant stated that apartment was in a building "off" Allied Drive and it was near the neighborhood center. Jenewein Road is off Allied Drive, and it is across the street from the neighborhood center.

Unlike the officers in *Wade*, Henderson did obtain some modest corroborating evidence by identifying a car that may have belonged to Campbell in the garage for 4711 Jenewein. Plaintiffs say that defendants should not have relied on the presence of the car because Campbell may have parked his car in the 4711 Jenewein garage "so as to not be discovered at his actual apartment." Dkt. 45, ¶ 52. In hindsight, that may be what Campbell was doing, but an officer assessing probable cause is permitted to rely on his own observations without investigating whether there may be explanations for what he sees other than the obvious. *See Burritt v. Ditlefsen*, 807 F.3d 239, 250-51 (7th Cir. 2015) (officer has no duty to investigate

once probable cause is established); *Beauchamp*, 320 F.3d at 743 ("[W]e look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight.").

Johnson and Henderson's efforts to confirm the targets cannot be described as good police practice. But that was the case in *Wade* too. Plaintiffs neither attempt to explain in their opposition brief why *Wade* isn't instructive nor cite other cases showing that defendants' conduct violated the Fourth Amendment. Under these circumstances, the court concludes that plaintiffs have failed to meet their burden to show that defendants are not entitled to qualified immunity on his claim. *See Wheeler v. Lawson,* 539 F.3d 629, 639 (7th Cir. 2008) (plaintiff has the burden to defeat a qualified immunity defense).

## B.    Show of force against children

Plaintiffs contend that defendants used excessive force against M.W. and J.C. by pointing guns at them. They cite *Baird v. Renharger*, 576 F.3d 340, 346–47 (7th Cir. 2009), which states that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment."

Plaintiffs don't cite testimony from anyone present regarding the extent to which any defendant pointed guns at M.W. and J.C. In fact, plaintiffs don't even say whether M.W. and J.C. were in the living room or the bedroom when officers entered the apartment. The only evidence about gun pointing that defendants cite is Nordquist's declaration, which states vaguely that he "pointed [his] firearm in the direction of" Horne and that he "made concerted efforts to avoid pointing [his] firearm at the children." Dkt. 36, at 2.

The body camera video doesn't provide much additional clarity. For the first few seconds after officers breached the door, the camera is still pointed outside the apartment. When the camera enters the apartment, it shows two officers pointing their guns in the

16

direction of Horne and the children, who are all standing close to Horne. As the officers direct Horne and the children out of the apartment, the two officers in view lower their guns so they are pointed toward the floor. No officers in view are pointing their guns at the children as they walk past the officers and exit the apartment. The video does not show any officers pointing their guns at the children found in the bedroom.

Based on this evidence, defendants are entitled to summary judgment. When defendants entered the apartment, they reasonably believed that the occupants of the apartment were heroin dealers and had access to guns. Both this court and the court of appeals have held that officers do not use excessive force under the Fourth Amendment by drawing their guns when entering a building associated with drugs because drugs and violence often go hand in hand. *Johnson v. Gullickson*, No. 20-cv-496-jdp, 2021 WL 5998522, at *4 (W.D. Wis. Dec. 20, 2021), *aff'd*, No. 22-1016, 2022 WL 2387350, at *2 (7th Cir. July 1, 2022). The officers did not immediately lower their guns when they saw Horne, but even if it was clear right away that Horne wasn't Campbell, it's reasonable to allow officers to assess the situation before letting their guard down.

The court will assume that officers had no reason to believe that M.W. or J.C. were dangerous (and that M.W. and J.C. were in the living room). But the video shows that it would have been impossible for the officers to point their guns toward Horne without also pointing them toward the children because Horne and the children were so close together. When the children approached the officers, the officers in camera view were not pointing their guns at the children.

Plaintiffs cite Freeman's testimony that her children haven't been the same since the incidents that gave rise to this case. The court does not doubt that the children's experiences

were traumatizing. But the test for determining a Fourth Amendment violation doesn't turn on the effect that an officer's conduct has on the plaintiff; it is whether the officer used reasonable force in light of the circumstances known to the officer at the time. *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). Accepting plaintiffs' view would impose a rule that officers may never point a gun at an adult, no matter how dangerous, if a child is next to the adult. Plaintiffs cite no authority for such a rule, so the court concludes that defendants did not violate the Fourth Amendment by briefly pointing a gun in the general direction of the children in the living room.

## C. Horne's detention

After officers entered plaintiffs' apartment, they detained Horne, placed him in handcuffs, made him wait in the squad car, and took him to the police station. After questioning him, officers drove Horne home and removed his handcuffs. This claim requires resolution of two issues: (1) whether the law was clearly established that officers could not detain Horne, under plaintiffs' version of the facts; and (2) if so, which defendants were personally involved in detaining Horne.

### 1. Clearly established law

Plaintiffs contend that Horne's detention was unlawful from start to finish because defendants had seen a photograph of Campbell just before entering the apartment, so they should have realized right away that Horne wasn't Campbell. But "officers executing a search warrant for contraband have the authority to detain the occupants of the premises while a proper search is conducted," even if they don't have individualized suspicion that an occupant has violated the law or is dangerous. *Muehler v. Mena*, 544 U.S. 93, 98 (2005). Placing an

occupant in handcuffs is also reasonable while conducting a search for drugs. *U.S. v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011). When officers first detained Horne, they reasonably believed based on the search warrant that there were drugs on the premises, so they were entitled under *Muehler* and *Bullock* to place Horne in handcuffs.

The situation changed when officers continued detaining Horne after they removed him from the building and took him to the police station. At that point, the parties agree that Horne's continued detention qualified as an arrest that needed to be justified by probable cause that Horne had committed a crime. Defendants do not contend that they still believed that Horne was Campbell by the time they took Horne to the police station. As plaintiffs point out, an officer can be heard on the body camera saying, "we don't have our target," so it is reasonable to infer that defendants knew that Horne was not the person they were looking for within a few minutes.

Defendants say that they had probable cause for two other reasons. First, they say that they continued to believe that they were at Campbell's apartment, so it was reasonable for them to believe that Horne was involved in drug trafficking with Campbell. Second, defendants say that officers found a firearm with an obliterated serial number at the apartment, so they had probable cause to believe that Horne had violated laws prohibiting possession of such a weapon. Dkt. 31, at 20 (citing 18 U.S.C. § 922(k)).

Defendants haven't shown that they are entitled to summary judgment under either theory. As for a belief that Horne was Campbell's accomplice, it is well established that "physical proximity to a suspected crime, without other indicia of involvement, is insufficient to support a finding of probable cause." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (internal quotation marks and alterations omitted). Numerous other cases have held the

same thing. *See id.* (collecting cases). Defendants cite no contrary authority. So Horne's presence at a suspected crime scene didn't justify his prolonged detention.

Defendants say that they were justified in believing that Horne was involved with Campbell's drug operation because "Horne did not immediately identify himself when officers first encountered him in the apartment, Horne was not a known lessee in the apartment where he was found, and it is common for drug traffickers to use the name of other associates to register housing." Dkt. 31, at 20. But defendants don't explain why any of these facts support a finding of probable cause. Horne testified that an officer asked for his identification, but at that point he was in handcuffs, so he told the officer that his ID was "right there" on the kitchen counter. Dkt. 26 (Horne Dep. 65:7–66:7). That is not evidence of criminal behavior. Nor is it suspicious that Horne wasn't a "known lessee." If anything, that would undermine a belief that he was involved in any illegal activity occurring in the apartment. And even if drug traffickers commonly register housing in someone else's name, that wouldn't support a conclusion that Horne in particular was a drug trafficker.

As for the belief that Horne possessed a prohibited firearm, defendants do not say that the discovery of that firearm was part of the reason for Horne's continued detention. That in itself is not a problem for defendants because "an arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that some criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect." *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010). Defendants also don't say where in the apartment the firearm was found or why it would be reasonable to believe that Horne had possessed the firearm. *See Taylor*, 26 F.4th at 432 ("We are not confident that the facts before us—proof that Taylor resided in one room with a blue gun found in another room—sufficed to

20

create probable cause."). But even assuming that Horne's presence in the apartment would support probable cause of possession, a reasonable jury could still find that officers did not have probable cause to arrest Horne.

Defendants cite no evidence that they were even aware of the firearm during the time relevant to this case. *Mwangangi v. Nielsen*, 48 F.4th 816, 828 (7th Cir. 2022) (probable cause is evaluated based on facts known to officers at time of arrest). As defendants themselves emphasize, the team that detained Horne was separate from the team that searched the apartment, and none of the defendants were involved in conducting the search.

In a footnote, defendants rely on the collective knowledge doctrine, under which "one officer's determination of probable cause may be imputed to other officers in the department, who may arrest on the basis of the first officer's finding." *Taylor*, 26 F.4th at 436. But the collective knowledge doctrine applies only when the arresting officer is in communication with and acting at the direction of another officer who has personal knowledge of the facts providing probable cause. *Mwangangi*, 48 F.4th at 828. Defendants can't rely on the doctrine simply because another officer may have known facts that could support a finding of probable cause. Defendants do not say that they were acting at the direction of the search team.

Even if defendants could rely on the collective knowledge doctrine, there is a factual dispute that precludes summary judgment. Specifically, both Freeman and Horne denied in their deposition testimony that the firearm was theirs or that they were even aware of its presence. Dkt. 26 (Horne Dep. 77:10–25) and Dkt. 25 (Freeman Dep. 45:13–46:19). In *Muhammad*, 900 F.3d at 908, the court held that similar testimony was enough to create an issue of material fact on whether the police planted the gun, so the same conclusion is required here.

Under the plaintiffs' version of the facts, which the court must accept as true, defendants had no evidence connecting Horne to Campbell or to an unlawful weapon. Because it is clearly established that probable cause cannot rest solely on a person's presence at a suspected crime scene, defendants are not entitled to qualified immunity on this claim for the purpose of defendants' motion for summary judgment.

## 2.  **Personal involvement**

The remaining question for this claim is which defendants were personally involved in prolonging Horne's detention. Personal involvement means that the defendant participated in the alleged constitutional violation, directed the conduct at issue, or failed to intervene despite an ability to do so. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022); *Doxtator v. O'Brien*, 39 F.4th 852, 865 (7th Cir. 2022); *Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012). Defendants say that only Weberpal was involved. Plaintiffs say that the five other defendants were also responsible, for different reasons.

First, plaintiffs say that Schroedl, Nordquist, and Simpson were part of the swat team that detained Horne, so it is reasonable to infer that they were personally involved in the detention. Defendants don't respond to that argument in their reply brief, so the court will deny summary judgment to these three defendants on this claim. *See Terry*, 910 F.3d at 1009.

Second, plaintiffs say that Johnson and Henderson were personally involved because they "made no effort to verify the address to be raided." Dkt. 46, at 7. The court has granted summary judgment to Johnson and Henderson on plaintiffs' claim related to the search warrant. But even if Johnson and Henderson violated the Fourth Amendment by failing to adequately verify the target's address, "one violation under the Fourth Amendment does not taint all later actions for the purpose of a civil claim brought under 42 U.S.C. § 1983." *Bernardi*

*v. Klein*, 682 F.Supp.2d 894, 902 (W.D. Wis. 2010). So Johnson and Henderson's conduct in obtaining the warrant doesn't provide a basis for holding them liable for Horne's prolonged detention.

Third, plaintiffs say that there is a factual dispute over whether Johnson was present at the apartment when Horne was detained and over whether Johnson interviewed Horne at the apartment and determined then that Horne was not the target. If Johnson was there, plaintiffs say, it raises the question of why Johnson did not intervene to stop Horne's detention before he was taken to the police station. Johnson denies that he was at the apartment, but plaintiffs cite a document on department letterhead called "Intra-department correspondence" authored by Lieutenant Erik Fuhremann. Dkt. 46-1. The document states that Fuhremann was "in charge of the overall operation" that led to the search of Freeman's apartment and that the purpose of the memo is "to show what happened and to identify actionable steps to insure this does not happen again." *Id.* at 1. In summarizing relevant events, the document states that Johnson "responded to the apartment" while the warrant was being executed and "[u]pon speaking with the detained adult male," Johnson "learned that Campbell did not reside in that apartment." *Id.* at 4.

Plaintiffs have not authenticated the memo, but defendants did not object to the admissibility of the memo on that ground or on the ground that the memo is hearsay, so the court will not decide those issues here.[12] Defendants object instead on the ground that it is

---

[12] There is at least a plausible argument that the relevant portion of the memo is not hearsay. The memo itself may qualify as a business record under Federal Rule of Evidence 803(6), and the statement about Johnson's presence at the apartment may qualify as a party admission under Rule 801(d)(2). Johnson admits in his deposition that he "spoke to [Fuhremann] the day of the incident," Dkt. 28, at 52:9–10, so the statement may be directly based on what Johnson told Fuhremann.

"immaterial" whether Johnson was at the apartment because there was probable cause to arrest Horne. Dkt. 48, at 15. But the court has concluded that a reasonable jury could find otherwise, so the dispute is material, and the court will allow Horne to proceed against Johnson on the unlawful-detention claim.

## D. Search of the apartment

Plaintiffs say that most of the search of the apartment violated the Fourth Amendment because officers "knew within three minutes of arriving that Quantaze Campbell did not reside at 4711 Jewell Rd., Apt. 204, and that he was not present in the apartment." Dkt. 46, at 2. Defendants seek summary judgment on this claim for one reason: they were not personally involved in the search. Specifically, they say that the search was conducted by a separate group of officers who are not parties to this case. Plaintiffs don't dispute that officers other than defendants conducted the search, and plaintiffs don't contend that any defendant can be held liable under a failure-to-intervene theory. By failing to respond to defendants' argument, plaintiffs forfeited this claim. *Terry*, 910 F.3d at 1009.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, Dkt. 30, is GRANTED in part and DENIED in part. The motion is denied on plaintiff Paul Horne's claim that defendants Caleb Johnson, Joseph Weberpal, Matt Nordquist, and Matt Shroedl detained Horne in violation of the Fourth Amendment. The motion is GRANTED in all other respects. The claims of plaintiffs Dianna Freeman, M.W., and J.C. are DISMISSED with prejudice.

24

Defendants Ryan Henderson, Frank Simpson, John Doe, and Jane Doe are DISMISSED with prejudice.

Entered February 23, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge